**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Willard Whalen,<br><br>        Plaintiff,<br><br>v.<br><br>Mormon Lake Fire District, et al.,<br><br>        Defendants. | No. CV-17-08135-PCT-DGC<br><br>**ORDER** |

Defendants have filed a motion for summary judgment on the claim brought by Plaintiff Willard Whalen under 42 U.S.C. § 1983. Doc. 54. The motion is fully briefed, and oral argument will not aid in the Court's decision. *See* Fed. R. Civ. P. 78(b); LRCiv. 7.2(f). The Court will deny the motion.

**I.   Background.**

    **A.   Relevant Events.**

Whalen worked as a volunteer firefighter with the Mormon Lake Fire District between 2011 and 2015, when his volunteer status was terminated. Whalen filed this suit under § 1983 against the Fire District, Clifton Terrell, and Glen Reagan. Doc. 1. He alleges a First Amendment retaliation claim arising from his termination.

Whalen was hired as a volunteer firefighter in 2011. Doc. 55 at ¶¶ 8, 10. In 2012, he was promoted to a paid part-time Shift Captain position. *Id*. He returned to volunteer

status in 2013. *Id.* Whalen's duties as a volunteer firefighter included attending training and responding to emergency calls. Doc. 55 at ¶ 8.

As Shift Captain, Whalen was responsible for training and evaluating firefighters, finding training opportunities and scholarships for volunteers and firefighters, ensuring minimum staffing levels were satisfied, organizing the Fire District's staffing resources to prepare for large events, and setting up a new fire division. Doc. 60 at ¶ 3; Doc. 55 at ¶ 11. In the Fire Chief's absence, Whalen served as Officer-in-Charge ("OIC"), assuming responsibility for managing the Fire District's operations. But Whalen could not write new policies, spend the Fire District's money, or make decisions reserved to the Fire Chief. Doc. 55 at ¶ 12. Whalen continued to manage personnel, including planning and staffing for events that drew large crowds to Mormon Lake, until his termination on September 4, 2015. Doc. 60 at 6.

Mormon Lake is home to 1,500 part-time residents and up to 10,000 visitors during peak summer months. Doc. 59 at 2. The Fire District is governed by a five-member Board. Doc. 55 at ¶ 1. The Board's duties include setting policies, managing the Fire District's finances, setting compensation, and reviewing operating procedures prepared by the Fire Chief. Doc. 60 at ¶ 1.

The Board hires the Fire Chief, who is then responsible for all personnel issues involving firefighters and administrative staff. Doc. 55 at ¶ 3. Final policymaking authority concerning personnel issues rests with the Fire Chief, not the Board. Doc. 60 at 3-4; Doc. 55 at 10; Doc. 56-3 at 107:15-111. Glen Reagan was Fire Chief between 2011 and 2015. Doc. 55 at ¶¶ 8, 10. Clifton Terrell was hired by the Board to succeed Reagan as Fire Chief in June 2015. Doc. 55 at ¶¶ 24-30.

Terrell allowed Reagan to continue serving in a senior capacity under his command. Doc. 55 at ¶¶ 24-30. On August 17, 2015, Terrell suspended Whalen. Doc. 55 at ¶ 71. Shortly after, Reagan and two volunteer firefighters – Blake Palen and James Goodall – gave Terrell reports concerning Whalen's allegedly insubordinate behavior towards Terrell during August 15, 2015 debriefings. Doc. 60 at ¶ 43.

Eleven days later, on August 28, 2015, Terrell convened what he referred to as a "tribunal" to discuss Whalen's discipline. Doc. 60 at 11. The tribunal's members included Reagan, Palen, and Board member Scott Gold. *Id*. According to Terrell, the tribunal unanimously recommended Whalen's termination. *Id*. Reagan denies taking part in, or even knowing of, a decision to terminate Whalen until after it happened. Doc. 55 at ¶ 78.

On August 31, 2015, Terrell wrote a memorandum about Whalen to Tim McNeal, Deputy County Attorney and the Board's legal counsel. Doc. 60 at ¶¶ 47-48. Titled "Statement of Cause," Terrell's memo provides McNeal with several reasons for Terrell's decision to terminate Whalen, including Whalen's deteriorating demeanor and his suggestion during a public Board meeting that former Fire Chief Reagan misappropriated funds and that his assistant falsified her time sheets. Doc. 60 at ¶¶ 47-48. Terrell terminated Whalen's volunteer status with the District on September 4, 2015. Doc. 60 at ¶ 49.

### B. Defendants' Version of Whalen's Termination.

According to Defendants, Whalen's insubordinate conduct first began in September 2014 when he applied for grants to hire new firefighters without consulting Reagan, who was then the Fire Chief. Doc. 55 at ¶¶ 21-22. As a result, Reagan gave Whalen a poor rating on teamwork during a performance review, noting that Whalen should have addressed department issues with the Chief. Doc. 55 at ¶¶ 21-22.

On June 30, 2015, Whalen sent an unauthorized email seeking to coordinate volunteer firefighter schedules in preparation for the July 4th weekend. Doc. 55 at ¶ 43. Terrell, who was then serving as Fire Chief, gave Whalen a verbal warning about the unauthorized email on July 8, 2015. Doc. 55 at ¶¶ 43, 47.

On July 22, 2015, Whalen sent another email to a state agency requesting firefighter training scholarships for himself and other Fire District volunteers. Doc. 55 at ¶¶ 51-56. According to Defendants, processing and handling scholarship requests is reserved to the Fire Chief and Terrell never authorized Whalen to send these requests. *Id*.

On August 15, 2015, Whalen made allegedly disparaging comments about Terrell's leadership during team debriefings. Whalen said he believed Terrell was not appropriately prepared for one event and questioned why Terrell could not be reached during another incident. *Id*.

### C. Plaintiff's Version of His Termination.

Whalen alleges that Reagan gave him a poor performance review in September 2014 because they disagreed about a firefighter safety issue that Whalen later brought to the Board during a public Board meeting. Doc. 55 at 85. Specifically, Whalen, who was serving as volunteer Shift Captain at the time, asked for the Board's guidance on resolving impasses relating to firefighter safety that arise between the Fire Chief and Shift Captain. Doc. 55-1 at 87. According to Whalen, he brought the matter to the Board because he did not want to expose the Fire District to liability for not providing proper safety equipment or otherwise excluding a volunteer from training on the basis of gender.[1] Doc. 55-1 at 89.

Whalen asserts that his duties as Shift Captain during Reagan's tenure included sending out staffing emails, such as the email about the July 4th weekend, and that he was never required to ask Reagan to authorize these emails. Doc. 60 ¶¶ 22-26. Whalen further claims he had no reason to believe his duties had changed under Terrell because, while serving as Fire Chief for nearly a month, Terrell never raised the matter with Whalen. *Id*. Whalen also claims that Terrell did not raise any issues about the July 4th staffing email until July 8, 2015. *Id*. That day, Terrell told Whalen the email was unauthorized because it could have had a financial impact on the Fire District. *Id*. Whalen explained that the email was part of his duties under Reagan and that staffing emails do not have a financial impact on the Fire District because firefighters do not expect payment for merely being on call. Doc. 59 at 6. Whalen agreed to ask for Terrell's authorization before sending any emails that could have a monetary impact on the Fire District. *Id*.

---

[1] According to Whalen, the disagreement involved Reagan's refusal to purchase protective equipment for a volunteer firefighter – who could not train with other volunteers because her protective equipment did not fit – claiming the department had no money. When Whalen questioned Reagan on how the department had no money only two months into its fiscal year, Reagan said: "well I am not going to buy her any boots." Doc. 55-1 at 86. Whalen accepted Reagan's decision, but said he disagreed with the rationale. *Id*. at 87.

- 4 -

Whalen asserts that the scholarship request he sent on July 22, 2015 was also part of his responsibilities under Reagan. Doc. 59 at 14. He claims that he informed Terrell that the scholarship deadline was coming up and asked whether the Fire District planned to request any. *Id*. Terrell confirmed that scholarships would be sought, but said he had not had time to send a request. *Id*. Later that day, Whalen sent the email requesting scholarships and copied Terrell. *Id*.

Whalen disputes that he singled out Terrell in his performance critiques during debriefings on August 15, 2015. Doc. 60 at ¶ 44. Whalen alleges that his comments focused on the whole team's inadequate preparation for handling two emergency calls, and that others at the debriefing echoed his critiques. *Id*.

Whalen contends that Defendants' use of these four incidents to terminate him was a pretext, and that he in fact was terminated because he engaged in protected speech. Whalen identifies several instances of such speech.

In June 2015, Whalen had separate conversations with Gold, McNeal, Reagan, and other Board members about various issues in the Fire District. Doc. 59 at 4-5. He expressed concern to Board member Gold about changes Reagan made to the OIC stipend policy a month before stepping down as Fire Chief. Whalen thought Reagan's changes were illegal because they concerned compensation and the Board did not approve them as required by A.R.S. § 48-805(A)(2).[2] *Id*. at n.3.

Whalen also told Gold that Reagan's assistant, Deborah Cargill, received a salary equivalent to $27.77 per hour when she was authorized to receive only $10 per hour. Doc. 59 at 4-5. He said Cargill was overpaid while the Fire District struggled to pay for training and equipment. *Id*.

During the same conversation, Gold told Whalen that the Board did not conduct a background check on Terrell before hiring him as Fire Chief. *Id*. Whalen said he would hire a private investigator to do a background check on Terrell because "red flags [were] all over the place." *Id*. Later that month, Whalen's private investigator found that Terrell

---

[2] Originally, the OIC received a stipend of $25 for 24-hours of service. Reagan's change raised this to $50 for 12-hours and $100 for 24-hours. Doc. 59 at 4.

had never served as a police officer despite his claim to the contrary in his application for the Fire Chief position. Whalen communicated these findings to individual Board members and to Reagan and Terrell. *Id*. In response, Terrell clarified that he had only ridden with law enforcement officers in their vehicles. *Id*.

Whalen raised these same issues with attorney McNeal in late June 2015. Doc. 59 at 5. Whalen also told McNeal that some Board members were ineligible to serve on the Board because they did not meet residency requirements. *Id*. McNeal later raised these issues with the Board.

During a July 2015 Board meeting, Whalen expressed frustration with the Board's inaction on his complaint that hourly employees were paid without accounting for their work hours. *Id*. He also raised concerns about the Fire District's failure to maintain minimum staffing levels, which he believed undermined its ability to protect the community. *Id*. at 8.

At the August 2015 Board meeting, Whalen asked the Board to clarify the review and approval process for standard operating procedures. Doc. 60 at ¶36-38. He also reiterated his previous concern about Reagan's new stipend policy and noted that he brought these issues to Gold's attention in early June. Doc. 60 at ¶ 37. In response, Gold said the Board "had to move on to defend [its] position" now that Whalen had raised the issues with attorney McNeal. *Id*. at ¶ 38.

## II. Summary Judgment Standard.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome of the suit will preclude summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**III. Analysis.**

While recognizing that this area of the law is complex, the Ninth Circuit has described five general issues to be addressed in a First Amendment retaliation case: "(1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech." *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). Defendants contend that Plaintiff can produce no evidence that (1) he engaged in expressive conduct on a matter of public concern, (2) Reagan and the Board (who were not authorized to terminate him) took any adverse employment action against him, or (3) his public expressions were a substantial and motivating factor in Terrell's decision to terminate him. Doc. 54 at 1.[3]

**A. Whether Whalen's speech addressed matters of public concern.**

"Speech involves a matter of public concern when it can fairly be considered to relate to any matter of political, social, or other concern to the community." *Eng*, 552 F.3d at 1070 (citations and quotation marks omitted). Speech that "deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of public

---

[3] In their reply brief, Defendants also argue that Plaintiff's claim fails because he spoke as a public official and not as a private citizen. Doc. 61 at 2-3. The Court will not consider arguments raised for the first time in a reply brief. *See Delgadillo v. Woodford*, 527 F.3d 919, 930 n. 4 (9th Cir. 2008).

concern." *Id.* (same). If some part of an expression addresses an issue of public concern, the expression warrants First Amendment protection even if other aspects do not. *Hyland v. Wonder*, 972 F.2d 1129, 1138 (9th Cir. 1992). A plaintiff in a § 1983 retaliation claim bears the burden of showing that his speech addressed an issue of public concern based on "'the content, form, and context of [the] statement, as revealed by the whole record.'" *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009) (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)).

Whalen argues that his speech involved matters of public concern because they addressed inept and potentially harmful administration of a governmental entity, misuse of public funds, and public corruption. Doc. 59 at 8. Defendants argue that because these issues stem from Whalen's personal conflicts with others in the Fire District, Whalen's speech addressed personnel disputes and grievances rather than matters of public concern. Doc. 60 at 2. Aside from a single conclusory sentence, however, Defendants do not provide factual support for their assertion that Whalen's complaints stem from personal disputes. Doc. 61 at 2:11-17.

Whalen has presented evidence that his speech addressed matters of public concern. These include at least six topics:

- Reagan's allegedly unauthorized changes to the OIC stipend policy;[4]
- Excessive compensation paid to Cargill;
- False claims by Fire Chief Terrell about having served as a law enforcement officer;
- The Fire District's failure to retain minimum staffing levels;
- The Board's unclear review and approval process for the Fire District's operating procedures, and;
- Improper appointment of two Board members who did not meet residency requirements.

---

[4] Whalen alleges that Reagan, after retiring, often served as OIC and received the financial benefit of his new stipend policy. Doc. 59 at 3, n.1.

The first two topics concern breaches of public trust and misuse of public funds. The third topic concerns the qualifications of the District's Fire Chief. The fourth topic concerns the general preparedness of the fire department. The fifth topic concerns the degree of Board oversight and control of the Fire District. And the sixth topic concerns the legality of the Board's decisions and whether it had the necessary quorum to conduct public business at various meetings. Matters concerning the use of public funds, the qualifications of government leaders, a fire department's preparedness, and the effectiveness and legality of a fire district's governing board are "inherently of interest to the public." *Hyland*, 972 F.2d at 1137-1138. This is not a basis for summary judgment.

### B. Whether Reagan and the Board Took Adverse Employment Actions.

Defendants concede that Terrell's termination of Whalen was an adverse employment action. Doc. 54 at 13. But they argue that the decision was Terrell's alone – that Reagan and the Board had no authority to terminate Whalen and in fact were not involved in the decision. *Id.* Plaintiff argues that the Board is liable for Terrell's decision because it delegated policymaking authority to him, and that Reagan participated in the termination decision and took other adverse employment actions against Whalen. Doc. 59.

#### 1. The Board's Potential Liability.

Relying on *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), Whalen argues that the Board is liable for his termination because it delegated its final policymaking authority over personnel disciplinary issues to the Fire Chief, and Terrell exercised that authority when he terminated Whalen. Defendants argue that vicarious liability cannot be used to hold the Board liable for an employee's actions under § 1983.

Section 1983 applies to local government units, *Monell*, 436 U.S. at 690, but a local government "is liable only for the actions of 'its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Cortez v. County of L.A.*, 294 F.3d 1186, 1189 (9th Cir. 2002) (quoting *Monell*, 436 U.S. at 694). "To hold a local government liable for an official's conduct, a plaintiff must first establish that the official (1) had final policymaking authority 'concerning the action alleged to have caused the particular

constitutional or statutory violation at issue' and (2) was the policymaker for the local governing body for the purposes of the particular act." *Id*. (quoting *Weiner v. San Diego County*, 210 F.3d 1025, 1028 (9th Cir.2000)).

Defendants concede that, "[a]s the Fire Chief, Chief Terrell had the sole authority to terminate Mr. Whalen and no one else (including Mr. Reagan or any of the District members) made the termination decision." Doc. 55 at ¶ 76. Several Board members also testified that the Board has no role in disciplining employees and that "[p]ersonnel issues were *always* dealt with by the chief." Doc. 60-3 at 3:20-4:8 (emphasis added); Doc. 56-3 at 107-111.

Because Terrell appears to have been the sole policymaker in the termination of Whalen, exercising authority delegated by the Board, the Board can be liable under *Monell*. This is not a basis for summary judgment.

### 2. Reagan's Potential Liability.

The record contains evidence that Terrell sought Reagan's input on the decision to terminate Whalen, and even convened a "tribunal" that included Reagan to approve the decision. *See, e.g.,* Doc. 56-2 at 56:12-20. This evidence creates a factual issue as to whether Reagan was involved in Whalen's termination, an act which Defendants agree was an adverse employment action.

Whalen also argues that Reagan's criticism of Whalen at the August 2015 Board meeting constituted an adverse employment action. Doc. 59 at 16. To qualify as an adverse employment action, an act need not be severe, of a certain kind, or in the form of a benefit removal or burden imposition. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1079 (9th Cir. 2013). The question is whether the employer's action is reasonably likely to chill employees from engaging in protected activity. *Id*; *see also Coszalter v. City of Salem*, 320 F.3d 968, 974-75 (9th Cir. 2003). Depending on the circumstances, even minor acts of retaliation can infringe on an employee's First Amendment rights where they create an impermissible chilling effect. *Dahlia*, 735 F.3d at 1079 (finding employer's ongoing threats and harassment qualify as adverse employment actions). Criticism and insignificant

1  verbal threats that cannot be reasonably expected to deter protected speech do not qualify as adverse employment actions. *Coszalter*, 320 F.3d at 975-976 (citing *Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998)).

The jury must decide whether Reagan's public statements about Whalen at the August 2015 Board meeting were sufficient to constitute an adverse employment action. This is not a basis for summary judgment.

### C. Substantial and Motivating Factor.

Defendants argue that Terrell's decision to terminate Whalen was based solely on Whalen's insubordination and that Whalen can produce no evidence that his protected speech was a substantial and motivating factor. Doc. 54 at 13. To establish that protected speech was a substantial and motivating factor in an adverse employment action, a plaintiff may present evidence that (1) the defendant expressed opposition to the protected speech directly to the employee or some other person, (2) the time between the defendant's alleged retaliatory action and the protected speech was sufficiently short for a jury to logically conclude that the protected speech motivated the action, or (3) the defendant's proffered explanations for the employment action were false and pretextual. *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 929 (9th Cir. 2004).

Whalen cites Terrell's "Statement of Cause" memo to McNeal as direct evidence of Terrell's motive. Doc. 59 at 10. The memo cites Whalen's statements at the July Board meeting as a basis for termination. Whalen also asserts that Reagan and Terrell expressed opposition to his speech. Reagan expressed opposition at the August 8 Board meeting when he publicly announced that he regretted hiring Whalen, and Terrell expressed opposition in his Statement of Cause memo to McNeal. *Id.* at 11-12. Whalen also notes that the termination decision occurred one month after the July Board meeting and only nine days after the August Board meeting where Whalen made allegedly protected statements. *Id.* at 11. And Whalen cites evidence to dispute each of Terrell's stated reasons for terminating him. *Id.* at 12-15.

- 11 -

The evidence creates a factual dispute as to whether Whalen's alleged speech was a substantial and motivating factor in the termination decision. This is not a basis for summary judgment.

**IT IS ORDERED** that Defendants' motion for summary judgment (Doc. 54) is **denied**. The Court has set a telephone conference for **February 13, 2019 at 4:00 p.m.** to set dates for a final pretrial conference and trial. Counsel for Plaintiff shall initiate a conference call to include counsel for all parties and the Court. If a dial-in number is to be used, counsel for Plaintiff shall email the dial-in number and instructions to counsel for all parties and the Court no later than February 12, 2019 at 12:00 noon. The email to use for the Court is campbell_chambers@azd.uscourts.gov.

Dated this 28th day of January, 2019.

*David G. Campbell*
David G. Campbell
Senior United States District Judge